Number 14-3987 T.R. v. Havens,et.al Is it Ms. Grossberg? Okay. Ms. McDonough and Mr. Wraith. Take your time. No problem. Okay. Okay. Whenever you're ready. Good morning and may it please the court. My name is Leslie Grossberg and I represent the appellant T.R. I'd like to reserve five minutes for rebuttal, please. That's fine. Section 1983 interposes the federal courts between the states and the people as guardians of the people's federal rights. Let me just maybe work a little bit backwards with you. As I understand 302, a person, if there is a concern about that person, they may be committed for up to five days. Is that right? That's correct. And then there is a longer commitment procedure under 303 that's at issue here as to whether he waived his rights with regard to that. And that could be for an additional, what, 20 days?  And Mr. T.R. or T.R. was altogether committed for, what, four days under, in effect, 302 and 303 together? Yes, that's correct. In other words, he was not free to leave for four days? For four days following his 303 commitment. Was it four days additional or four days total? I thought when he went in, spoke with Barry, had Havens listening, et cetera, that the total number of days that he was not free to leave was four. Am I wrong? I apologize, Your Honor. I cannot confirm that. Take a look at that on rebuttal. If I'm right, and you can tell me if I'm wrong, but if I'm right, even if you have an action against the county, let's say, and we'll get to whether you do or you don't, or Havens or whoever it might be, whomever it might be, wouldn't the damages be nominal? It's a disputed question of fact, Your Honor. Under Cary v. Pipus, for instance, the 1978 decision, even if the deprivation would have occurred, regardless of the procedure used, the plaintiff may still present evidence on compensatory damages. I'm thinking about a 1997 Supreme Court case, Edwards v. Allisock, B-A-L-I-S-O-K, and it's at 520 U.S. 641. And on page 645 of that decision of the Supreme Court, it talks about if the procedures were wrong, but not necessarily that the result was. In effect, the damages could be negligible. That's possible. But here we've pleaded that TR suffered compensable damages based on the deprivation of his procedural due process rights, stemming from his frustration at not having the hearing, from the stigma of being committed, and from his now distrust of the government. Well, you have two things going on that may help you. His own circumstance where Barry says, will you follow the regimen that I set up? And he said, sure, thinking that he's going to get out. And the court did find him credible in making that statement. And that when new protocols were put into play a few years ago, the number of waivers dropped dramatically from 50% down to 5%, or something like that. That's correct. But what else did you discover, if anything, during discovery that indicates that the county was part of setting, or did set, the custom or practice that Barry and Havens followed in this case? It was largely set by Dr. Barry himself, who is under contract with the County Office of Behavioral Health to provide this psychiatric examination service and, more importantly, to then testify in the commitment hearings on behalf of the county administrator. And so Dr. Barry's role is very critical. What exactly is the policy that you contend the county maintained, or the custom? In your appellate brief, you indicate it's a custom of not having counsel meet with the patients. Is that the policy? Yes, the unconstitutional... I just want to make sure I understood. Your policy is that there was a custom of having counsel not meet with the patients. But doesn't the record show that the decision not to meet with the patients was Havens' decision, and that it was because Havens decided he would wait outside the room so as to not interfere with the dialogue between the independent evaluator, in this case Dr. Barry, and the patient? So how is that the county's policy? It's the county's policy in that the joint action of both Havens and Barry is necessary for that policy to be effected. Why is that so? I mean, if it's Havens' decision, and Dr. Barry had no role in deciding whether Havens entered the room or not. In fact, his deposition testimony talks about the fact that Havens would come into the room if there was some indication that the patient wanted to discuss the hearing further. So how is this? I guess my trouble is I can't figure out how this is the county's policy. I would attribute the policy to Dr. Barry just as much as Mr. Havens, and that's shown at pages 433 and 434 of the appendix. And what does it say there? That if Dr. Barry determines that there is a problem, in that the patient does not agree to continue treatment, at that point Dr. Barry will explain to the patient, here's Mr. Havens, you can talk to him about it. And from that, do you have any other episodes, other than the episodes with TR, that that type of encounter occurred? Just Dr. Barry's own testimony that what he did with TR was his usual practice. But the question is, there has to be, how much discovery was there in this case? How much time did you have for discovery before you had summary judgment? Several months, Your Honor. Okay. And so don't you need to have some sort of, I mean, it sounds like from your earlier answer that Barry probably was inundated with matters. Havens was probably inundated with matters, I guess 2,000 a year. And these two came up with an efficient way to try to deal with it, and it probably cut a lot of corners. But where is it that this is a custom or practice that was imparted to Barry and Havens by the county? I mean, you have one person's individual experience, and at the end you have, when the protocols were changed, that there was a dramatic decrease in waivers. So it looks like it's showing that maybe there could be something here. You may be on the right path, but there has to be a next step on the right path to show that the county was involved in this and set a policy or set a custom. So part of the problem here has to do with the very nature of these proceedings, which are extremely confidential and concern people's medical records, and that's why discovery was not taken. So were efforts to try to learn about other patients made? Yes. Did you make an application to the court? Did you get a court order telling you what you could or could not do? No, Your Honor. Is the evidence of the dramatic decline in waivers from 50 percent to 5 percent, would that be presentable to a fact finder, or does the subsequent remedial measure rule come into play at all? It does not, Your Honor, for a couple of reasons. So Rule 407 only bars admissibility of subsequent remedial measures taken by the defendant. And in this case, the subsequent remedial measure was not effected by the county, the defendant. It was effected by the President Judge of the Court of Common Pleas. It also doesn't apply because the change in procedure, we argued below and we argue now, shows that the additional due process safeguards that we say are constitutionally required are feasible, and that's expressly permitted under Rule 407. And finally, I would argue that the county waived that argument. With respect to the change by the judge, you're saying that the change in the process because the President Judge told Mr. Havens how he wanted proceedings to occur, doesn't that undercut the fact that it was a county policy? He's not a county actor. Dr. Berry wasn't a policymaker. So doesn't the fact that the President Judge directed Mr. Havens make it more clear that it wasn't a county policy, but it was the way the court wanted things run, and Havens, as the public defender for those proceedings, decided the policy? Your Honor, my time has expired. May I answer your question? Go ahead. Mr. Havens is a state actor. It's well settled that even state court judges are state actors. They just happen to be immune from liability. That was my question. I'm asking about Mr. Havens and whether the judge's direction to him undermines the fact that the county policy about meeting with counsel, and this even assumes there's a federally protected right to counsel. VITEC doesn't say there is, but we'll put that aside for a moment. I want to just finish this one last question. Thanks for the clarification, Your Honor. The policy here that brings the county into the loop is that they were continuing to present the petitions that they knew were obtained without the assistance of an independent advisor, and even though Havens was directed by the President Judge to change the procedure, it's something that the county could and should have been doing all along. Okay. We'll get you back on rebuttal. Ms. McDonough. Thank you, Your Honor. May it please the Court. I'd like to start by saying that Section 303 clearly states who does what and when. Let me just ask a fact question. How long was in total? Eight days. Oh, he was in eight days. May 26th. Okay. I'm sorry. Eight days. So in other words, you added on, you did the five days under 302 and then three additional days, or was it two days under 302 and six days under 302? I don't know how they do those calculations, frankly, but I think that when you go to court you stop being a 302 and then you become a 303. So that sounds like you were there for six days. So that would be a demarcation. Okay. So eight days total. And it was a holiday as well, and that was one of the reasons I think that T.R. was unhappy being there. Section 303 says that it's an informal conference, number one, that is to be held to determine for this extended 20-day commitment. And it goes on to say the judge or mental health review officer shall inform the person of the nature of the proceedings. Well, his complaint is that he wasn't given notice of the nature of the proceedings. He was asking a question on a totally different topic, and the judge did find him credible. With all due respect, T.R. was a licensed Pennsylvania attorney. He admitted that he had received notice that he was to have a hearing, that he received a notification of right sheet that told him he would have a hearing and he had a right to counsel, and he testified that he was confused by this because – But the notice of intent to file a petition, the so-called right sheet, the explanation of rights, that wasn't even filled out and signed, was it? Well, it's not supposed to be filled out and signed. It doesn't necessarily have to be filled out and signed. A social worker, and it says mental health worker, the forms themselves say who's to do that. And a mental health worker meets with the petitioner and tells them what's going to happen, and then the person is supposed to sign the form saying, I'm the one that gave the rights. The social worker in this case failed to do that. So now we're left with Barry, and Barry testified as to what he did, but on pages 433, I think, and 434 of the appendix, he leaves out whether he informed T.R. of his right to a hearing. Well, he testified that he did ask him, he said, I won't put you through the hearing. If you want to follow your doctor's recommendations, I won't put you through that. And he's talking to a licensed attorney, mind you, and he's talking to someone who's not incompetent, and T.R. says he was competent. So Dr. Barry is saying, I won't put you through that. If you want to follow your doctor's program, and T.R. admits that he knew his doctor wanted him to stay in the hospital. His doctor had met with him, Dr. Rivera, said, I want to extend your commitment. T.R. acknowledges that he knew that, that Dr. Rivera was making that recommendation. That was the basis of the 303. And when Dr. Barry meets with him and says, do you want to follow what your doctor is recommending, T.R. already knew what that was. It was for the continued involuntary commitment under 303. He had the paperwork in hand that said that. And he had even discussed it with people, wanted to know, had people read it to him, any areas about what the doctor was recommending. He was very clear that he went through that with the staff at the hospital to know exactly what his doctors were recommending would occur. It sounds as if the court found T.R. credible. And T.R.'s testimony was that he was asked a question on another matter, would you follow directions with regard to your treatment? And the next thing he knows, there's a purported waiver of a hearing. The explanation of rights for him isn't filled out. And you have, when the court later on says that you have to change your protocols in terms of the notice that you give people, it drops by 90%. I'd like to address that because I don't think that the court said you have to change your protocols because what you're doing is wrong. So what did happen? What the court said, and what Mr. Havens testified, is the court changed that protocol to protect Havens from being sued in the future and to protect people from ending up having this adversarial position later. This whole informal conference has now turned into something quite formal. When you say that it's gone from having 50% down to 5% in terms of who's going to contest and require a full hearing, you're talking about people seriously, seriously mentally ill people who are brought down to a courtroom and that are now having to come into the courtroom to acknowledge that they understand in a very formal way, which is not contemplated by the Mental Health Procedures Act, mind you. They're now coming in in great numbers together and being asked if they want to have a full hearing. It's become an adversarial position. It's changed from what it used to be and is supposed to be to something different. And that's why there has been an increase in the people saying, well, I'll have a full hearing, I'll have one too. But the point is, if they exercise that formal right to have a hearing, it just means you have a hearing. And if they are seriously ill, chances are close to 100% that the courts will agree with the person saying we should, under 303, keep this person in longer than up to 20 days. Your Honor, in Pennsylvania, and in this particular case, there was a hearing at which testimony was taken. The issue here wasn't I was denied a hearing. The issue in this case is, did I know that I had a right to be present at the hearing? Did I voluntarily waive it? Do you need a colloquy, for instance, in order to effectuate a knowing and voluntary waiver? Is that the formal way that we're going to deal with the informal conference that's contemplated by the Mental Health Procedures Act? He knew he had a right to an attorney and he knew he had a right to a hearing. That's not at issue. He's claiming he didn't have meaningful access to an attorney because he's claiming that he needs an attorney to decide if he wants to have a hearing. And I think that's really the issue that is being brought before the court. Do you need to have an attorney to sit down and talk to you about whether or not you want a hearing? Does that have to be in advance? Where in the record is it that he knew that he was waiving his rights at the hearing? Dr. Barry asked him, do you want to go along with your doctor's recommendation, which he acknowledged he knew was to further the involuntary commitment, and TR said yes, and Dr. Barry said, all right, then I won't put you through the formal hearing. Both Havens and Barry say the same thing. TR has said he was confused. So if somebody says to you, I won't put you through a formal hearing, it sounds like there won't be a formal hearing. It means that he will not have to come in himself to a formal hearing in order to hear in public basically that he has been further involuntarily committed. And that's the real issue here. And what does the county have to do with this? Even if we get there, what does the county have to do with this? The county did exactly what they're supposed to do. They coordinated mental health court. They had a solicitor who actually represents the hospital that puts on the petitions. If there is going to be an adversarial situation with the hearing, doctors will come down from upstairs as well. I think that Delaware County does more than most other counties that I know of in terms of giving rights. You have an independent court psychiatrist. He's an independent court-appointed psychiatrist. He's not a puppet of the county, not a county employee who's rubber-stamping anything, and he testified that his job, being appointed by the president judge, is to determine whether the appropriate commitments are being made medically. You're saying Dr. Berry is appointed by the court? He is, Your Honor. And that's been very clear. Your adversary says that Dr. Berry and Mr. Havens worked together to further some custom of not having counsel meet with patients. It's your view that can't be a county policy because he was not a county official. He's an independent consultant, but he's a court-appointed psychiatrist who essentially reports to the court what his findings are. So you have the certification by Dr. Revere or whatever doctor is making the 303 recommendation, and then you have this neutral court-appointed psychiatrist that looks at it and says, is this the right way to go with this? And meets with the actual patient. Does this patient really need this type of commitment? Is this the proper length of commitment being recommended? There's this extra play here that is to the benefit of the patient. It's not adversarial. It's not where Dr. Berry is a county person that's rubber stamping what the hospital is doing and then trying to rush it all through. There's no reason that he would want to do that. This is a system that is designed to help the person, and when we put in all kinds of stringent procedural mechanisms that are going to put that process, you have what we have now. It was interesting. Mr. Havens said, and I think it's something the court should consider, I felt that it was more therapeutic to my clients to stand there and listen and make sure they did understand that they had a right to a hearing. Put yourself in TR's position. I'm sorry? Put yourself in TR's position. You have possible suicidal thoughts. You speak to your doctor. You go into the hospital. You do all the things you're supposed to do, and it looks like the crisis, in his view, has passed. And somebody then says, whoa, you ain't leaving. You just waived your rights. Wouldn't you feel like, hey, wait a minute, there's something wrong here? That's really colloquially what this comes down to. My time is up, but if I may, I don't think that's what happened here at all. I think TR very well knew what the recommendation was going to be. He very well knew he had a right to a hearing. Did his doctor later testify? The psychiatrist that he was consulting over the years, did he testify at all? In the hearing that was held? No, at any time, in discovery here. TR never even wanted to have that doctor come in. TR only wanted to have the 302 and the 303 expunged, had a full hearing about this, testimony about this in the Court of Common Pleas of Delaware County. Judge Green found him to be incredible, as I'm sure that if ever it went to a fact finder, the same result would obtain. What is the effect of that? I wanted to ask that one question. I think the effect of that is that it should bar any determination otherwise by this court. I do believe that Rupert Feldman would bar it. I also believe Heck bars it. Rupert Feldman doesn't really apply here, if you look at Exxon Mobil's Supreme Court. But does the Heck rule apply here? I believe it does, and the courts have held that it applies to involuntary commitment hearings. If you decide that he deserves something different than what he got. But usually if there's a conviction. Pardon me, Your Honor? Usually if there's a conviction. There's no conviction here. Well, Your Honor, there's Supreme Court precedent, and there's other precedent that says Heck bars challenges to civil court involuntary commitments. In a case dealing with somebody who was previously convicted of, what was it, child molestation or something? Well, there are cases, no, I think that... That involved a previous conviction of some sort, did it not? I don't think that that matters because I think that when you're ready to get out of prison, if you're ready to get out of prison, you're no longer serving your sentence. If somebody files an involuntary commitment proceeding against you, even if you had previously been in prison, it is then simply a civil involuntary commitment proceeding under the Mental Health Act. But that would be asking us to extend Heck, would it not, to something that we're... To you, I was never convicted of any crime. I don't think you have to be convicted of any crime. I think that Heck bars any situation where the courts are going to reverse and nullify the orders of the trial courts in this case. In what cases? Any circuit cases that say that Heck applies to this type of civil commitment proceeding in which there was not previously some type of criminal conviction? I don't think that the courts have made that determination, except I think that the rubric is certainly there, and this court should make that determination. I think your better argument is that there's no county custom or practice, is it not? An even further best argument is that TR was treated delicately. He was treated with great compassion and care by everybody involved in that commitment proceeding. He received all the procedural due process rights to which he was entitled, and there's nothing faulty about the system that was utilized. All right, let's hear from Mr. Raith. Thank you. I'm pleased to court Mark Allen Raith for Mr. Havens. I guess I'm going to surprise nobody here by saying I think Judge Satarsky got it right when she granted Mr. Havens' motion to dismiss early on and found that he was not a state actor. How did this process develop where he would sort of stand by the doorway and listen to a conversation that a doctor would have with a person who would have come in for purposes of being treated for psychological problems? I think the evidence on that came in after I filed the case, but I was at Mr. Havens' deposition, and I think he said that kind of evolved over a period of time. He began doing this work in 1983, and I don't think he was crystal clear on when he began to handle it that way because these commitments were conducted in different places and in a different manner when he started doing them. But I believe he said that this kind of came about when he began dealing with Dr. Barry at this particular hospital. Was it his idea? Was this his method of representing these patients? I don't think he ever took authorship for the idea. He certainly endorsed it. He certainly thought he was doing what was best for the people involved. Was it because he didn't want to interfere with what he viewed as a potentially therapeutic exchange between patient and an evaluator? That is correct. He didn't want to interject himself. And I think as the complaint pointed out, I think the phrase was confused, disoriented, distressed. He thought, you know, we're dealing with people who are in that kind of condition. He did not think it was in their best interest for him to interject himself in the process immediately and say, you know, you don't have to listen to what this doctor is telling you. You know, you can go have a hearing if you want. He just didn't think that was in their best interest. Is there anything in the record that would demonstrate that the county played a role in either establishing that practice? There is nothing in the record. As I said, I wasn't part of the development of that record, but I don't think there's anything in the record that suggests that anybody in the county ever approached him and suggested that's the way he handled him. And I think as the court has gotten into some of the issues regarding what happened later, the only person that he has ever spoken to in connection with the handling of these things is the president judge. So I think just to, and I know my issue here is not particularly a wide one, but I think once we get to the starting point that he was court appointed, I think it's almost a presumption that he is not a state actor. I think there's only one of two ways that the other side can kind of get out of that box, and that's if they can show that there was joint action or at least sufficiently allege that there was joint action. I think the judge correctly concluded that the complaint failed to do that, or whether Mr. Havens was acting in some kind of administrative capacity when he handled these cases in that way, and I think he clearly was not acting in any kind of administrative capacity. And if I can jump ahead, I wanted to just make one brief argument on the issue of qualified immunity. Obviously we're contending that he's not a state actor, so the qualified immunity part of this thing doesn't really come into play in our view. But in the event that it would, I think that he would clearly be entitled to qualified immunity. I think one of the statements I noticed in the other side's appellate brief was that a private citizen such as Mr. Havens would not be entitled to qualified immunity. I think that's basically a misleading interpretation of what the Supreme Court has said. I think the Supreme Court said fairly recently in the case of Filarski v. Delia that a private individual who's working for the government could conceivably be entitled to qualified immunity. I think in this instance, I think Mr. Havens definitely would be, and he would be subject to the same kind of protections about a clearly established constitutional right, which I don't think he violated in this case. I have no further questions. Thank you. Thank you. Ms. Grossberg. Thank you. I'd actually like to start where Mr. Raith just left off, which is is there a clearly established right to independent assistance before being involuntarily committed for psychiatric treatment? And the answer is yes. It is clearly established under VITAC, and the county is asking you to find that having the doctor provide legal advice and having the attorney make a therapeutic decision somehow satisfies the requirements of due process under VITAC. Doesn't VITAC say we're not saying that there is a right to counsel for these sorts of proceedings? It absolutely did hold that there has to be an independent advisor. The district court found that that independent advisor could be Dr. Berry, but that is just a total misreading and misapplication of VITAC. My question is, though, isn't that what VITAC says at the end of the opinion? It's saying we're not holding that there's a right to counsel. For justice plurality would have found a right to counsel, and Justice Powell's controlling concurrence did find that the independent and qualified assistance that's required could be provided by an appropriate, competent layperson or medical professional. When Mr. T.R. got out after eight days, what was the reason that he was freed at that point or no longer committed? I presume that it was because he had gotten his medication under control and his treating physician felt that he was no longer a danger to himself or the community. And when you had discovery in this case, the other side is saying that to some extent his own treating psychiatrist was in favor of having him, Mr. T.R., stay for an extended period of time. If that's incorrect, why not depose that psychiatrist during discovery in this case? I'm actually a little unclear on which doctor Your Honor is referring to because the treating psychologist who directed T.R. to go to Crozer Chester and present himself for an evaluation was a psychologist he had met with once or twice, did not have a longstanding relationship with, and then once he was in the hospital, he did see, I believe, Dr. Rivera was the physician. That is his physician? It was the person who treated him while he was in emergency commitment at Crozer Chester. But that's not his regularly treating? It was not, Your Honor. Does he have a regularly treating psychiatrist? Not really. We did provide interrogatory responses about that issue, and he's had quite a few physicians and quite a few psychologists and psychiatrists over the years. Did his psychologist give testimony that he did or did not suggest to Dr. Berry that T.R. needed to stay for a longer period of time in order to be sure that things were stabilized? No, I don't think that that happened, Your Honor. I think that the representation that was... Did he testify at all, that psychologist? Did Dr. Rivera? No, the other doctor, his psychologist that he was seeing prior to this incident in May. No, Susan Mitchell did not testify, or she was not deposed. The reason for that? It didn't seem relevant to the issue, since we're only challenging the process used for the 303 commitment. The facts underlying the process and the circumstances by which he was committed under 302 on an emergency basis wasn't relevant to our findings. If his own psychologist theoretically were to say, I think he needs to stay there a bit longer until we're sure he's stabilized, would that not weigh in what's going on here? I mean, if he said, for example, I never said that, wouldn't that bolster your due process claim? I think it would, but I think that the real issue here is that TR didn't receive the independent assistance that he was required to receive under VITEC, and that doesn't have anything to do with whether someone that he had... Let's assume you're right. You still need to make the next step that this was somehow a county custom or practice. So the regulations implementing the Mental Health Procedures Act explicitly delegate authority to the counties, to the county administrator, to the office of behavioral health in this case, to put into place the administration and the effecting of these commitments, and that's at 55 Pennsylvania Code, section 5100.56B. So in your judgment, is what happened in the Pennsylvania State Court and the expungement proceedings completely irrelevant? Yes, Your Honor. It's a different issue. In this case, we're only challenging the processes by which TR was committed. We're not challenging the certification of commitment itself under 303, and it only is pertinent to the deprivation of process that TR suffered here pre-commitment. Thank you very much. Thank you to all counsel, and we'll take the matter under advisement.